**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| MONICA PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20CV1030 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Monica Patterson, brought this action pursuant to Section 205(g) of the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claims for Disabled Widow's Benefits ("DWB"). (Docket Entry 1.) Defendant has filed the certified administrative record (cited herein as "Tr. __"), and both parties have moved for judgment (Docket Entries 15, 18; see also Docket Entry 16 (Plaintiff's Memorandum); Docket Entry 19 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DWB (Tr. 188-95), alleging a disability onset date of December 11, 1996 (see Tr. 189).[2] Upon denial of that application initially (Tr. 65-76, 110-13) and on reconsideration (Tr. 77-109, 122-27), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 120-21, 129). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing (Tr. 39-64), during which Plaintiff amended her onset date to July 10, 2017 (see Tr. 210). The ALJ subsequently ruled that Plaintiff did not qualify as disabled within the meaning of the Act. (Tr. 12-31.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 313-21), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

---

[2] "For [DWB], in addition to showing disability, a claimant must show that she is a widow who has attained the age of fifty and is unmarried (unless one of the exceptions in 20 C.F.R. § 404.335(e) [] appl[ies]) and that her disability began before the end of the prescribed period." Fraley v. Astrue, No. 2:10-cv-00762, 2011 WL 2681647, at *2 (S.D.W. Va. July 11, 2011) (unpublished) (citing 42 U.S.C. § 402(e) and 20 C.F.R. § 404.335). "The prescribed period [for DWB] ends with the month before the month in which the claimant attains age 60, or, if earlier, either 7 years after the worker's death or 7 years after the widow was last entitled to survivor's benefits, whichever is later." Fraley, 2011 WL 2681647, at *2 (citing 42 U.S.C. § 402(e)(4) and 20 C.F.R. § 404.335(c)(1)). In this case, Plaintiff's prescribed period began on September 21, 2017, the date her husband died (see Tr. 15) and, thus, Plaintiff had to establish that her disability began on or before June 30, 2022, the last day of the month before the month in which Plaintiff will attain age 60, in order to obtain DWB. "The definition of disability for [DWB] is the same as for the standard disability case and the five-step sequential evaluation process is applicable to [DWB] cases." Lavender v. Colvin, No. 1:10CV903, 2014 WL 237980, at *2 & n.4 (M.D.N.C. Jan. 22, 2014) (unpublished) (citing 20 C.F.R. §§ 404.1505(a), 404.1520(a)(2)).

Case 1:20-cv-01030-CCE-LPA   Document 20   Filed 01/10/22   Page 2 of 30

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.   It was previously found that [Plaintiff] is the unmarried widow of the deceased insured worker and has attained the age of 50.   [Plaintiff] met the non-disability requirements for [DWB] . . . .

2.   The prescribed period ends on June 30, 2022.

3.   [Plaintiff] has not engaged in substantial gainful activity since July 10, 2017, the amended alleged onset date.

4.   [Plaintiff] has the following severe impairments: lumbar radiculopathy with mild anterolisthesis of L4 on L5, L5-S1; right shoulder bursitis/adhesive capsulitis status-post right rotator cuff repair in February 2018; neurofibromatosis; and osteoarthritis of the left knee.

. . .

5.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

6.   . . . [Plaintiff] has the residual functional capacity to perform medium work . . . with the following exceptions.  She can frequently climb ladders, ropes and scaffolds.  She can frequently climb ramps or stairs, balance, stoop, crouch, kneel and crawl.  She can frequently reach overhead with her upper right extremity.

. . .

7.   [Plaintiff] has no past relevant work.

. . .

11. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

3

. . .

12. [Plaintiff] has not been under a disability, as defined in the . . . Act, from July 10, 2017, through the date of this decision.

(Tr. 18-30 (bold font and internal parenthetical citations omitted).)[3]

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). In this case, Plaintiff has not shown entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal

---

[3] Although the ALJ found that Plaintiff had severe "right shoulder bursitis/adhesive capsulitis status-post right rotator cuff repair in February 2018" and had a "history of a total left knee replacement" (Tr. 18 (emphasis added); see also Tr. 21, 23, 27), the record fails to reflect that Plaintiff underwent either procedure (see Tr. 361-62, 464, 1178-82 (documenting Plaintiff's conservative treatment for right shoulder pain), 1030, 1190, 1258 (containing imaging of Plaintiff's left knee failing to reflect a total knee replacement)).

4

standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct

5

application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)). "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity

6

to (4) perform [the claimant's] past work or (5) any other work."
Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475
n.2 (4th Cir. 1999).[4]  A finding adverse to the claimant at any of
several points in the SEP forecloses an award and ends the inquiry.
For example, "[t]he first step determines whether the claimant is
engaged in 'substantial gainful activity.' If the claimant is
working, benefits are denied.  The second step determines if the
claimant is 'severely' disabled.  If not, benefits are denied."
Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at
each of the first three steps, the "claimant is disabled." Mastro,
270 F.3d at 177.  Alternatively, if a claimant clears steps one and
two, but falters at step three, *i.e.*, "[i]f a claimant's impairment
is not sufficiently severe to equal or exceed a listed impairment,
the ALJ must assess the claimant's residual functional capacity
('RFC')." Id. at 179.[5]  Step four then requires the ALJ to assess

---

[4] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled.  See id. at 179-80.   However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[6]

## B.  Assignments of Error

Plaintiff contends that the Court should overturn the ALJ's finding of no disability on these grounds:

(1) "[t]he ALJ erred by failing to perform a proper function-by-function evaluation of Plaintiff's ability to lift, stand and walk when formulating Plaintiff's RFC" (Docket Entry 16 at 4 (bold font and single-spacing omitted)); and

---

[6] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

(2) "[t]he ALJ failed to account for Plaintiff's need to elevate her lower extremities in the RFC" (id. at 11 (bold font and single-spacing omitted)).

Defendant contends otherwise, and seeks affirmance of the ALJ's decision. (See Docket Entry 19 at 10-18.)

## 1. Function-by-Function Evaluation

In Plaintiff's first issue on review, she alleges that "[t]he ALJ erred by failing to perform a proper function-by-function evaluation of Plaintiff's ability to lift, stand and walk when formulating Plaintiff's RFC." (Docket Entry 16 at 4 (bold font and single-spacing omitted).) According to Plaintiff, her neurofibromatosis causes Plaintiff to have "bumps all over her body, from her head to the bottoms of her feet" (id. (citing Tr. 46)), that limit her ability to stand, walk, and lift (id. at 4-5 (citing Tr. 46-47, 50-52)).[7] Plaintiff contends that the record contains "extensive documentation of [her neurofibromatosis]" (id. at 5; see also id. at 5-8 (detailing evidence Plaintiff believes documents severity and limiting effects of her neurofibromatosis (citing Tr. 324, 328, 372, 378, 404, 443, 453, 457, 473, 729, 740, 751, 753, 756, 814, 819-20, 829, 871, 916-18, 921, 937, 1015-17, 1023, 1030, 1049, 1053, 1061, 1077, 1086, 1122, 1130, 1134, 1137,

---

[7] "Neurofibromatosis is a genetic disorder of the nervous system. It mainly affects how nerve cells form and grow. It causes tumors to grow on nerves. . . . Usually the tumors are benign, but sometimes they can become cancerous." https://medlineplus.gov/neurofibromatosis.html (last visited Dec. 14, 2021).

9

1152, 1155-56, 1202, 1208, 1215, 1235, 1257))) and that, despite that evidence, "the ALJ found that [Plaintiff] could perform the full range of lifting, standing and walking that is required of **medium** work" (id. at 8 (emphasis supplied by Plaintiff) (citing Tr. 22)).

Plaintiff further asserts that "[w]hat little explanation is offered by the ALJ runs afoul of longstanding Fourth Circuit precedent . . . regarding the evaluation of complaints of pain" (id. at 9 (citing Arakas v. Commissioner of Soc. Sec., 983 F.3d 83 (4th Cir. 2020))), in that the ALJ improperly relied on "normal range of motion and benign physical examination results" (id. at 10 (citing Tr. 27)), which "'simply have no relevance to the severity, persistence, or limiting effects' of the painful neurofibromas that cover [Plaintiff]'s body" (id. (citing Arakas, 983 F.3d at 97-98)) and "penalize[d Plaintiff] for only seeking treatment that is consistent with how her condition is generally treated" (id. (citing Arakas, 983 F.3d at 101)). Plaintiff maintains that the ALJ's errors prejudiced her because, had the ALJ limited her to less than medium work, Rule 202.04 of the Medical-Vocational Guidelines would have directed a conclusion of disabled. (Id. at 11 (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 202.04).) Plaintiff's contentions fail to warrant relief.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R.

§ 404.1545(a).  An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain.  <u>See</u> <u>Hines</u>, 453 F.3d at 562–63; 20 C.F.R. § 404.1545(b).  The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy).  <u>See</u> 20 C.F.R. § 404.1567.  Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level.  <u>See</u> 20 C.F.R. § 404.1569a(c).

An ALJ need not discuss every piece of evidence in making an RFC determination.  <u>See</u> <u>Reid v. Commissioner of Soc. Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014).  However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion." <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).  As to the role of the function-by-function analysis in that determination, the relevant administrative ruling states: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . .  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Social Security Ruling 96-8p, <u>Policy Interpretation Ruling Titles II and XVI:</u>

_Assessing [RFC] in Initial Claims_, 1996 WL 374184, at *1 (July 2, 1994) ("SSR 96-8p").

The Fourth Circuit has addressed this administrative ruling and the issue of whether an ALJ's failure to articulate a function-by-function analysis necessitates remand. _See_ _Mascio v. Colvin_, 780 F.3d 632, 636–37 (4th Cir. 2015). Specifically, it stated "that a per se rule is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are irrelevant or uncontested," _id._ at 636, but that "'remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review,'" _id._ (internal brackets and ellipsis omitted) (quoting _Cichocki v. Astrue_, 729 F.3d 172, 177 (2d Cir. 2013)). Here, the ALJ did not perform a function-by-function analysis of Plaintiff's abilities to lift, stand, and walk (_see_ Tr. 22-29); however, no basis for remand exists, because the ALJ's decision nevertheless supplies the necessary "accurate and logical bridge," _Woods_, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and her findings that Plaintiff's neurofibromatosis (A) qualified as severe (_see_ Tr. 18) but (B) did not cause limitations greater than the lifting, standing, and walking requirements of medium work (_see_ Tr. 22).

12

First, the ALJ's analysis of Plaintiff's subjective symptom reporting explains the ALJ's lifting, standing, and walking limitations. Although Plaintiff cites a large quantity of objective evidence to support the existence and extent of her neurofibromatosis (see Docket Entry 16 at 5-8 (citing Tr. 324, 328, 372, 378, 404, 443, 453, 457, 473, 729, 740, 751, 753, 756, 814, 819-20, 829, 871, 916-18, 921, 937, 1015-17, 1023, 1030, 1049, 1053, 1061, 1077, 1086, 1122, 1130, 1134, 1137, 1152, 1155-56, 1202, 1208, 1215, 1235, 1257)), Plaintiff relies primarily on her own subjective statements to support the argument that her neurofibromatosis symptoms should have compelled the ALJ to include greater lifting, standing, and walking limitations in the RFC (see id. at 4 (reciting Plaintiff's testimony that, "if she stands more than 15 minutes, the bumps on her feet become irritated" (citing Tr. 46), and "that she cannot walk more than a block at a time in shoes" (citing Tr. 50); see also id. at 5 (pointing out Plaintiff's testimony that "[i]t is hard for her to lift boxes because of the bumps on her hands" (citing Tr. 53)). The ALJ acknowledged Plaintiff's testimony regarding alleged limitations from her neurofibromatosis (see Tr. 23, 29), as well as her statement on a Function Report "that she had great pain due to her neurofibromatosis and she was in pain more than half the day" (Tr. 23 (citing Tr. 238)), but found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of

13

[her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 23). As detailed below, the ALJ did not reversibly err with respect to that finding.

Plaintiff maintains that the ALJ erred by "requiring objective evidence to support subjective pain symptoms[, which] improperly increase[d Plaintiff]'s burden of proof[,] as [Plaintiff] is 'entitled to rely exclusively on subjective evidence to prove' her symptoms are severe enough to prevent her from performing work activity." (Docket Entry 16 at 9-10 (quoting Arakas, 983 F.3d at 96).) In that regard, Plaintiff faults the ALJ for noting "that diagnostic imaging, surgical history, and lab reports d[id] not support [Plaintiff]'s allegations" (id. (citing Tr. 23)), because "multiple scans performed over many years have indicated [Plaintiff]'s extensive lesions, she has had three excisions of particularly painful lesions during the relevant time period, and her lesions are visible to the eye and have been noted by multiple doctors" (id.). Plaintiff further challenges the ALJ's reliance on "normal range of motion and benign physical examination results" (id. at 10 (citing Tr. 27)), which "'simply have no relevance to the severity, persistence, or limiting effects' of the painful neurofibromas that cover [Plaintiff]'s body" (id. (citing Arakas, 983 F.3d at 97-98)). Plaintiff additionally objects to the ALJ's observation of "routine and conservative treatment for [Plaintiff]'s pain" (id. (citing Tr. 29)), asserting that "[t]he

14

ALJ cannot penalize [Plaintiff] for only seeking treatment that is consistent with how her condition is generally treated" (id. (citing Arakas, 983 F.3d at 101)).

As an initial matter, Plaintiff overstates the reach of Arakas. That case holds only "that ALJs may not rely on objective medical evidence (or the lack thereof) — even as just one of multiple factors — to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." Arakas, 983 F.3d at 97 (emphasis added). Here, Plaintiff has readily admitted that objective evidence such as "multiple scans performed over many years" document her neurofibromatosis, as well as that "her lesions are visible to the eye." (Docket Entry 16 at 9.) Thus, unlike fibromyalgia, neurofibromatosis does not constitute a "disease that does not produce [objective medical] evidence," Arakas, 983 F.3d at 97.

In addition, although Arakas "reiterate[d] the long-standing law in [the Fourth C]ircuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms," Arakas, 983 F.3d at 98, long-standing cases containing the substance of that holding, such as Craig and Hines (among others), clarify that, "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective

15

evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers," Craig, 76 F.3d at 595 (emphasis added); see also Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d at 595). In other words, under the appropriate circumstances, an ALJ may choose to rely exclusively on a claimant's subjective symptom reports to find disabling symptoms; however, Arakas does not compel ALJs to consider only subjective evidence, as such a requirement would conflict with the regulations, which plainly require ALJs to consider a variety of factors, including objective medical evidence, in evaluating the intensity, persistence, and limiting effects of symptoms. See 20 C.F.R. § 404.1529(c) (directing ALJs to assess a claimant's medical history, medical signs and laboratory findings, daily activities, testimony about nature and location of pain, medication and other treatment used to alleviate pain, along with medical opinions from examining and non-examining sources); see also 42 U.S.C. § 423(d)(5)(A) ("Objective medical evidence of pain . . . established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether [an] individual is under a disability." (emphasis added)).

16

Here, in compliance with <u>Arakas</u>, <u>Hines</u>, and <u>Craig</u>, the ALJ considered the objective medical evidence as <u>one part</u> of her evaluation of the limiting effects of Plaintiff's neurofibromatosis. The ALJ additionally considered the opinion evidence of record (<u>see</u> Tr. 27-28) (discussed in greater detail below), and Plaintiff's daily activities, observing that, despite complaints of disabling pain, Plaintiff remained able to "shop in stores, prepare meals and do housework" (Tr. 20), as well as "tend[] to her personal care needs[,] . . . walk [for exercise] and use public transportation" (Tr. 23). The ALJ also commented on the type and effectiveness of Plaintiff's treatment, noting that Plaintiff "received mostly routine and conservative treatment for her impairments" (Tr. 27; <u>see also</u> Tr. 29), that she "routinely reported that her medications were adequately controlling her pain symptoms" (<u>id.</u>; <u>see also</u> Tr. 29), and "that she recovered well from her surgical procedures and was able to ambulate normally, without the use of [a] cane or assistive device" (Tr. 28; <u>see also</u> Tr. 29).

The record supports those observations by the ALJ. A large quantity of Plaintiff's treatment consisted of discrete complaints of a variety of symptoms which resolved quickly with treatment. (<u>See, e.g.</u>, Tr. 400 (8/10/17 orthopedic visit with complaint of right shoulder pain after heavy lifting treated with steroid injection without follow-up), 464 (3/14/18 visit with orthopedist for right shoulder pain after loading garbage cart treated with

17

steroid injection), 761 & 1026-30 (August 2018 ER visits reporting left knee pain after fall treated with steroid injection and Naproxen), 907-14 & 1279-83 (November 2018 ER visits for toe fracture after walking into couch treated with splint and pain medications), 1010-14 (8/2/18 treatment at ER for injury to left leg after hitting it on dolly in airport), 1254-58 (12/27/18 emergent visit for left knee pain after fall).) The record also bears out the ALJ's observation that medications improved Plaintiff's more chronic symptoms. (See, e.g., Tr. 403 (8/18/17 pain management treatment note reflecting Plaintiff had "good relief" of back pain on ibuprofen and Norco), 473 (3/22/18 primary care visit noting that Lasix helped "some" with Plaintiff's lower extremity swelling), 786 (8/15/18 orthopedist report documenting that previous steroid injection reduced Plaintiff's right shoulder pain), 933-66 (2018 surgical records referencing Plaintiff's successful recovery from neurofibroma excisions), 1202 (1/9/19 primary care treatment document recording that Plaintiff reported 0/10 on pain scale).)

Moreover, Plaintiff's criticism of the ALJ for relying upon objective findings such as "diagnostic imaging, surgical history, and lab reports" (Docket Entry 16 at 9 (citing Tr. 23)), as well as "normal range of motion and benign physical examination results" (id. at 10 (citing Tr. 27)) to discount Plaintiff's subjective reports of neurofibromatosis symptoms falls short. Those

18

observations by the ALJ occur in paragraphs in which she analyzed Plaintiff's treatment for multiple physical impairments, rather than just neurofibromatosis. (See Tr. 23 (noting Plaintiff "ha[d] a treatment history for several physical impairments" and detailing Plaintiff's array of reported symptoms), 27 (summarizing impact of all of Plaintiff's impairments on RFC).)

Furthermore, Plaintiff's objection to the ALJ's observation of "routine and conservative treatment for [Plaintiff]'s pain" (Docket Entry 16 at 10 (citing Tr. 29)), because "[t]he ALJ cannot penalize [Plaintiff] for only seeking treatment that is consistent with how her condition is generally treated" (id. (citing Arakas, 983 F.3d at 101)) ultimately fails to establish grounds for remand. The ALJ did find at one point in the decision that Plaintiff "received only routine and conservative treatment for her pain symptoms" (Tr. 29 (emphasis added)), which would conflict with the record evidence of Plaintiff's surgeries to remove painful neurofibromas (see Tr. 1061-67, 1077-81, 1086-91). However, earlier in the decision, the ALJ found that Plaintiff "received mostly routine and conservative treatment for her impairments" (Tr. 27 (emphasis added)), expressly acknowledged that Plaintiff "underwent an amputation of her toe and surgical removal of several nodules" (id.), as well as found that Plaintiff's "surgical procedures went well and without complications" (Tr. 29), and that she "recovered from her surgeries and ambulated normally, without an assistive device" (id.).

19

Moreover, although the ALJ's observation about "routine and conservative treatment" (Tr. 29) may lack applicability to Plaintiff's neurofibromatosis, the ALJ made that observation when discussing Plaintiff's treatment for the pain she alleged from any of her claimed impairments, including lumbar radiculopathy, right shoulder bursitis/adhesive capsulitis, and osteoarthritis of the left knee (see id. (citing Tr. 360-409, 471-84, 725-84, 874-914, 922-71, 1010-1177, 1222-84)). Plaintiff makes no argument that the ALJ improperly described Plaintiff's treatments for those impairments as "routine and conservative" (Tr. 29). (See Docket Entry 16 at 4-11.) Given that consideration and the other adequate grounds for discounting Plaintiff's symptom severity reporting made manifest in the ALJ's decision, to the extent the ALJ described Plaintiff's treatment for neurofibromatosis as "routine and conservative" (Tr. 29), she committed, at most, harmless error which does not warrant relief. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); see also Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

20

Second, the ALJ's evaluation of the opinion evidence further explains the sitting, standing, and walking limitations in the RFC. In that regard, the ALJ found "persuasive" (Tr. 27) the opinions of the state agency medical consultants that Plaintiff remained capable of lifting 50 pounds occasionally, 25 pounds frequently, and six hours total of standing and walking in an eight-hour workday (see Tr. 72-73, 86-87, 102-03), but added postural restrictions (see Tr. 22), to further account for Plaintiff's left knee pain (see Tr. 28). Moreover, none of Plaintiff's medical providers opined that Plaintiff's neurofibromatosis necessitated any (let alone greater) lifting, standing, or walking limitations, which significantly undermines Plaintiff's argument. See Pineda v. Astrue, 289 F. App'x 710, 713 (5th Cir. 2008) (holding that "ALJ properly noted[ that] the record d[id] not contain any specific opinions from treating or examining physicians, based on objective evidence, indicating that [the plaintiff] ha[d] limitations greater than those determined by the ALJ"); Nava v. Berryhill, No. 8:17CV2412, 2019 WL 92620, at *6 (M.D. Fla. Jan. 3, 2019) (unpublished) ("Importantly, the ALJ noted that the record does not contain any opinions from treating/examining doctors . . . that the [p]laintiff has limitations greater than the RFC."); Charrette v. Commissioner of Soc. Sec., No. CV 15-10930, 2016 WL 7985332, at *8 (E.D. Mich. Aug. 4, 2016) (unpublished) (rejecting the plaintiff's argument that "RFC determination failed to account for exertional

limitations resulting from severe fatigue, pain, and bilateral ankle impairment" where "ALJ appropriately noted[ that] the record d[id] not contain any opinions from treating or examining physicians indicating that the claimant [wa]s disabled or even ha[d] limitations greater than those determined in th[e] decision"), recommendation adopted, 2016 WL 4561333 (E.D. Mich. Sept. 1, 2016) (unpublished); Ortman v. Commissioner of Soc. Sec., No. 2:14CV1900, 2016 WL 2595111, at *2 (S.D. Ohio May 5, 2016) (unpublished) ("[S]ignificantly, the record contains no medical opinion of greater limitations than those that the [ALJ] included in her RFC determination.").[8]

In short, Plaintiff's first assignment of error fails as a matter of law.

## 2. Need to Elevate Lower Extremities

In Plaintiff's second and final issue on review, she contends that "[t]he ALJ failed to account for Plaintiff's need to elevate her lower extremities in the RFC." (Docket Entry 16 at 11 (bold font and single-spacing omitted).) In particular, Plaintiff points out that, "[o]n December 8, 2017, [she] indicated that the swelling [of her right lower extremity] was worse with walking and Dr.

---

[8] Plaintiff points to a notation in a cardiologist's report on August 23, 2018, that Plaintiff "could not walk adequately for stress testing purposes." (Docket Entry 16 at 7 (citing Tr. 740).) The report reflects that Plaintiff complained of chest pain "associated with [shortness of breath], leg pain and leg edema" which caused "poor exercise tolerance" and "trouble walking up and down the stairs at home." (Tr. 741.) Thus, that notation does not establish that Plaintiff's neurofibromatosis caused her difficulty walking.

Wilson Tabe instructed her to keep her leg elevated" (id. (citing Tr. 447)), as well as that, "[o]n August 2, 2018, [Plaintiff] was again noted to have edema to a portion of her left lower leg and she was again advised to elevate the extremity" (id. at 12 (citing Tr. 1012-13)). Plaintiff additionally references other occasions occurring intermittently throughout the relevant period in this case on which her providers noted edema and/or swelling in a lower extremity. (Id. at 11-12 (citing Tr. 443, 445-46, 448, 473, 751, 753, 1027, 1202, 1282).) According to Plaintiff, "[d]espite that evidence, the ALJ d[id] not evaluate [Plaintiff]'s need to elevate her legs and d[id] not account for it in the RFC determination." (Id. at 12 (citing Tr. 22-29).) Plaintiff deems that "oversight a significant error," because "the need to elevate her legs periodically to relieve [her lower extremity] swelling, as instructed by her doctors, would certainly impact her ability to work a full-time job." (Id.) Plaintiff's contentions fall short.

As an initial matter, Plaintiff did not include lower extremity swelling/edema or a need to elevate her legs among the nine conditions listed on her Disability Report as "limit[ing her] ability to work." (Tr. 226.) Similarly, neither Plaintiff's Function Report nor one completed by her sister make any mention of lower extremity swelling or a need to elevate the legs. (See Tr. 238-45, 246-52.) In a subsequent Disability Report, Plaintiff commented only that her "[right] leg swells" (Tr. 258 (emphasis

23

added)), and did not state that the swelling necessitated leg elevation (see Tr. 257-66; see also Tr. 269-76 (final Disability Report not addressing leg swelling or elevation).) Moreover, in her testimony before the ALJ, Plaintiff declared only that, if she stood for five to six hours, her left knee would swell and hurt (see Tr. 54), and did not mention any need to elevate her legs (see Tr. 41-58). The Court should not fault the ALJ for failing to include a limitation in the RFC that Plaintiff and/or her counsel did not deem worthy of inclusion in any of her disability-related filings and statements. See Crisco v. Kijakazi, No. 1:20CV239, 2021 WL 4414155, at *3-5 (M.D.N.C. Sept. 27, 2021) (unpublished) (Osteen, J.) (finding no merit to the plaintiff's argument that "the ALJ failed to account for any limitations caused by [the p]laintiff's migraines in [the] RFC assessment," because "[the p]laintiff did not provide any testimony as to the severity or the functional impact of her migraine headaches, . . . [and] did not even include migraine headaches as a disabling impairment on her Disability Report" (some brackets omitted)); Davis v. Commissioner of Soc. Sec. Admin., No. 2:18CV10228, 2019 WL 2051899, at *8 (E.D. Mich. Feb. 19, 2019) (unpublished) ("[W]here [the p]laintiff was represented by counsel, the ALJ was entitled to rely on counsel to present [the p]laintiff's case and to develop her claims," and "[t]he regulations do not transform [the ALJ] into the claimant's solicitous companion." (internal citations, quotation marks, and

24

some brackets omitted)), recommendation adopted, 2019 WL 1324239 (E.D. Mich. Mar. 25, 2019) (unpublished); Sturdevant v. Colvin, No. 15CV643, 2017 WL 9480895, at *4 (N.D. Okla. Jan. 5, 2017) (unpublished) (rejecting the plaintiff's "assert[ion] that the ALJ erred in failing to identify any limitations accounting for . . . [her] severe impairment of obesity," where the plaintiff "never mentioned or discussed her obesity or its effect on her functional limitations in her adult function reports or in her hearing testimony"), recommendation adopted, 2017 WL 1197825 (N.D. Okla. Mar. 30, 2017) (unpublished); Frost v. Colvin, No. 3:16CV47, 2016 WL 6493971, at *12-13 (M.D. Tenn. Nov. 2, 2016) (unpublished) ("[The p]laintiff argues that the ALJ erroneously . . . failed to evaluate the exact degree of limitation [the p]laintiff's physical impairments cause," but "[the p]laintiff alleged no physical impairments or resultant complications on his [] disability report[s].", recommendation adopted, 2016 WL 7386471 (M.D. Tenn. Dec. 21, 2016) (unpublished); Mayfield v. Colvin, No. 4:14CV740, 2015 WL 3460558, at *5-6 (W.D. Mo. June 1, 2015) (unpublished) (finding ALJ did not err in "fail[ing] to incorporate the effects of [the plaintiff's] . . . back pain [] in the RFC," where she "did not list difficulty secondary to back pain in her Adult Function Report").

Beyond Plaintiff's failure to raise leg elevation as an issue before the ALJ, Plaintiff has additionally not shown that any lower

extremity swelling and/or edema that does appear in the record constituted more than a temporary condition (often caused by discrete injuries) that improved with treatment. Plaintiff's first complaint of lower extremity swelling in the record occurred on November 30, 2017, when she complained to her primary care physician, Dr. Tabe, of leg swelling, right greater than left. (See Tr. 448.) On examination, Dr. Tabe found swelling in Plaintiff's right leg, but normal gait and no neurological deficit, tenderness, or redness. (Id.) Dr. Tabe prescribed Lasix and potassium supplements and ordered a venous Doppler ultrasound. (Id.) At a follow-up visit on December 8, 2017, Dr. Tabe informed Plaintiff of her normal ultrasound results, could no longer appreciate any swelling in Plaintiff's right lower extremity, and advised Plaintiff to "keep [her] leg elevated." (Tr. 447; see also Tr. 1151-53 (12/8/17 ER visit finding tenderness in Plaintiff's right calf, but normal gait and ultrasound).) Plaintiff continued her reports to Dr. Tabe of leg swelling on December 18, 2017 (see Tr. 446), January 9, 2018 (see Tr. 445), and February 9, 2018 (see Tr. 443). Although Dr. Tabe found +2 edema in Plaintiff's extremities at two of those follow-up visits, he did not repeat his advice to Plaintiff to elevate her legs. (See Tr. 445-46.)[9]

---

[9] At three emergency room visits during this time, Plaintiff complained of ongoing right lower extremity pain and swelling (see Tr. 452, 1042, 1151), but providers documented no edema, full range of motion, as well as normal strength, sensation, pulses, and gait (see 453, 1043, 1152), and did not advise Plaintiff

(continued...)

Plaintiff next sought to establish care with a new primary care physician, Dr. Najibullah Muradi, on March 22, 2018, and continued to complain of pain and swelling in her right leg. (See Tr. 473.) Dr. Muradi did note non-pitting edema in Plaintiff's lower extremities, but found normal gait, strength, and neurological function (id.), and did not advise Plaintiff to elevate her legs (see Tr. 474). Notably, at visits to the emergency room and to her neurofibromatosis surgeon, Dr. Leon Stockton, in April, May, and June 2018, providers repeatedly found no edema in Plaintiff's lower extremities during examinations. (See Tr. 936, 946, 956, 966, 1069.)

On August 2, 2018, Plaintiff presented to the emergency room with complaints of left leg pain after hitting that leg on a dolly in the airport. (See Tr. 1010.) Providers noted bruising and swelling on Plaintiff's left outer leg just above the ankle (see Tr. 1012), and advised Plaintiff to "elevate her leg" and "apply warm compresses" (Tr. 1013). Shortly thereafter, Plaintiff sought emergency department care after a fall while walking in the dark that resulted in a left knee contusion (see Tr. 1026-28), but the provider did not recommend leg elevation (see Tr. 1028), and subsequent examinations in September, October, and November 2018 lacked any further findings of edema (see Tr. 880-912). The record

---

[9](...continued)
to elevate her legs (see Tr. 453, 1044, 1152).

reflects two more emergency room visits in November and December 2018 related to _specific injuries_ to Plaintiff's lower extremities (_see_ Tr. 1254-58 (12/30/18 ER visit for fall on left knee during walk resulting in recommendation for "RICE" protocol, i.e., rest, ice, compression, elevation), 1279-83 (11/23/18 ER visit for fracturing right fourth toe on couch and finding edema in Plaintiff's right lower extremity)).

Plaintiff thereafter visited Tricia Reich, NP, in January 2019 to establish primary care and undergo an annual physical examination. (_See_ Tr. 1197-1202.) Nurse Reich noted _mild_ bilateral ankle edema (_see_ Tr. 1202), changed Plaintiff's Lasix to HCTZ (_see_ Tr. 1197), and recommended that Plaintiff elevate her legs in the afternoon, decrease her salt intake, and increase her physical activity (_id._). Significantly, following that examination _no_ further findings of edema exist in the record. (_See_ Tr. 1224-46; _see also_ Tr. 1235 (specifically noting _no_ edema on April 9, 2019).)

As the above discussion makes clear, Plaintiff's complaints of lower extremity swelling occurred at most intermittently, and often in the context of specific injuries to Plaintiff's lower extremities. Moreover, two of the four instances in which a provider recommended leg elevation came in the context of emergency room visits for discrete injuries that resolved. (_See_ Tr. 1013, 1258.) The remaining two leg elevation statements constituted one-

Case 1:20-cv-01030-CCE-LPA   Document 20   Filed 01/10/22   Page 28 of 30

time, isolated suggestions from Plaintiff's primary care providers (see Tr. 447, 1197); however, a recommendation that a patient undertake certain ameliorative measures does not equate to a physical restriction or a judgment about what Plaintiff can still do despite her impairments, see Cruz v. Commissioner of Soc. Sec. Admin., No. CV-19-04460, 2020 WL 3567033, at *2 (D. Ariz. July 1, 2020) (unpublished) (holding that "ALJ was not obligated to include a need to elevate the legs when sitting in the RFC finding," because the doctor "merely recommended that [the p]laintiff elevate her legs when sitting" and "did not state it was necessary for work" (internal quotation marks and brackets omitted)), aff'd, No. 20-16651, 2021 WL 5357231 (9th Cir. Nov. 17, 2021) (unpublished); Valentine v. Commissioner of Soc. Sec. Admin., No. 1:18CV1887, 2019 WL 4395177, at *11 (N.D. Ohio July 23, 2019) (unpublished) (finding doctor's "recommend[ation] . . . that [the plaintiff] elevate his legs to treat his varicose veins" and "discharge instructions after an emergency room visit . . . to elevate his legs above the level of [his] heart when at rest" failed to qualify as "medical opinions that [the plaintiff]'s varicose veins caused work-related functional limitations" (internal quotation marks omitted)), recommendation adopted, 2019 WL 4394168 (N.D. Ohio Sept. 13, 2019) (unpublished); Carpenter v. Berryhill, Civ. No. 16-179, 2017 WL 2909413, at *2 (E.D. Ky. May 12, 2017) (unpublished) (noting lack of clarity whether cardiologist's "advice that [the plaintiff]

29

elevate his legs qualifie[d] as a 'medical opinion,'" because recommendation "never specified how high, how often, or for how long" the plaintiff must "elevate his legs" and "failed to explain how his treatment recommendation would restrict [the plaintiff]'s physical activity or limit his ability to perform work-related functions").

In sum, Plaintiff's second assignment of error misses the mark.

### III. **CONCLUSION**

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 15) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 18) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld<br>
**L. Patrick Auld**<br>
**United States Magistrate Judge**

January 10, 2022